## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| TRACIE-ANN WILLIAMS, | ) | CASE NO: 3:17CV02524 |
| on behalf of I.A.B., | ) | |
| | ) | JUDGE JEFFREY J. HELMICK |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Tracie-Ann Williams ("Williams"), on behalf of her minor daughter, I.A.B., filed this *pro se* challenge to the final  decision of the Acting Commissioner of Social Security, Nancy A. Berryhill ("Commissioner"), denying I.A.B.'s claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq.*  This matter is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report & Recommendation.  For the reasons set forth below, the Magistrate Judge recommends the Commissioner's final decision be AFFIRMED.

### I.  PROCEDURAL HISTORY

In February 2015, Williams filed an application for SSI on behalf of her daughter I.A.B., a child under the age of eighteen, alleging a disability onset date of August 1, 2013 and claiming I.A.B. was disabled due to a speech delay, cognitive delay, hyperactivity, and excessive falling. (Tr. 224, 254.)  The application was denied both initially and upon reconsideration.  (Tr. 159,

1

165.)  Williams timely requested an administrative hearing. (Tr. 168.)

On September 13, 2016, an Administrative Law Judge ("ALJ") held a hearing during which I.A.B., represented by counsel, and Williams appeared.  (Tr. 87-102.)  On November 9, 2016, the ALJ issued a written decision, finding I.A.B. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the listings. (Tr. 54-86.)  The ALJ's decision became final on November 22, 2017, when the Appeals Council denied further review.  (Tr. 1.)

On December 4, 2017, Williams filed a *pro se* complaint, on behalf of I.A.B., to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 12.)  Williams does not assert any specific challenges to the ALJ's decision in her one-page brief on the merits.  (Doc. No. 11.)  Rather, she notes I.A.B. is still receiving treatment and has three additional diagnoses, without citing to any specific transcript page number.  (*Id.* at 1.)  This is not in compliance with this Court's Briefing Order.  (*See* Doc. No. 4.)

However, as Plaintiff is proceeding *pro se* and because the Commissioner's brief on the merits provides arguments as to why the ALJ decision was supported by substantial evidence, the Court will address and reference those arguments in the interest of fairness.  (*See* Doc. No. 12.)

## II. Evidence

***Personal Evidence***

I.A.B. was born in June 2013, and was a "older infant" at the time the application was filed and a "preschooler" on the date of the hearing, pursuant to 20 C.F.R. § 416.926a(g)(2).  (Tr.

127, 60.)

***Relevant School Record and Medical Evidence***[1]

On October 7, 2014, I.A.B. had a 15-month well-child examination with pediatrician Joyce M. Bevington, M.D.  (Tr. 370.)  Williams requested a referral to Help Me Grow and expressed concerns over I.A.B.'s language development.  (*Id.*)  Williams indicated I.A.B. understood simple commands, could point to more than one body part, but did not use many words beyond "mama" and "dada."  (*Id.*)  I.A.B. was walking well and her physical examination was normal.  (Tr. 370, 372.)  Dr. Bevington referred I.A.B. to Help Me Grow programming for her speech delay.  (Tr. 372.)

On February 16, 2015, I.A.B. fell backwards onto her right wrist.  (Tr. 334.)  She visited the emergency room, where she received a short arm cast on her right arm.  (Tr. 332.)

I.A.B. had a consultation with pediatric specialist Michael Walker, M.D., on June 22, 2015.  (Tr. 423.)  She was 24 months old at the time.  (*Id.*)  Williams expressed concerns over I.A.B.'s aggressive behavior, tantrums, the need for constant supervision, and language development.  (*Id.*)  She reported I.A.B. spoke 10 words but no two-word phrases, could follow simple commands, and pointed to 4-5 body parts.  (*Id.*)  On examination, I.A.B. made good eye contact, pointed to several body parts, followed single commands and a two-step related command, and spoke about five words.  (*Id.*)  Dr. Walker noted I.A.B.'s expressive language skills were at the 18-month old level, while her receptive language was at the 22-month old level.  (Tr. 424.)  Dr. Walker diagnosed disruptive behavior disorder and an expressive language

---

[1] The Court's recitation of the record is not intended to be exhaustive, and focuses upon the evidence the Commissioner cites in her Brief.  Moreover, as noted *supra*, Williams does not reference or cite to any evidence in her Brief.

3

disorder with mild adaptive delays.  (*Id.*)  He recommended I.A.B. attend speech therapy and Williams and I.A.B. undergo parent-child interaction behavior therapy ("PCIT").  (*Id.*)

I.A.B. subsequently began speech therapy and PCIT.  (Tr. 440, 438.)  In PCIT, the treatment focus was on decreasing disruptive behaviors and following directions.  (Tr. 438.)

On January 4, 2016, I.A.B. underwent psychological testing with psychiatrist Allison Burke, Ph.D.  (Tr. 572-576.)  I.A.B. was two years and six months old at the time.  (Tr. 572.) Williams also attended and provided information regarding I.A.B.'s background.  (*Id.*)  Williams reported I.A.B. had fractured her arm in February 2015 after falling off a bed.  (*Id.*)  She also indicated I.A.B. began to walk and talk at one year, was not yet toilet trained, and "refuses to go to bed."  (*Id.*)  Williams indicated I.A.B. spoke a "limited number of phrases," used sign language to communicate, was frequently aggressive towards others, and disliked having her "hair brushed, finger nails cut, and diaper changed."  (Tr. 573.)

During the assessment, I.A.B. exhibited appropriate eye contact, appeared calm, was cooperative, and was "eager to please the examiner and responded well to verbal praise and encouragement."  (*Id.*)  I.A.B. did occasionally leave her seat to walk around the room and required redirection on several occasions, but was "attentive to tasks subsequent to additional redirection."  (*Id.*)  Dr. Burke administered a battery of tests on I.A.B., which yielded (1) an Early Learning Composite score in the average range; (2) an Adaptive Behavior Composite score in the low range; and (3) Emotionally Reactive, Withdrawn, Sleep Problems, Attention Problems, and Aggressive Behavior scores in the clinical range.  (Tr. 574.)  Testing also indicated average abilities in visual reception, fine motor skills, and receptive language.  (*Id.*) I.A.B.'s expressive language score was in the below average range.  (*Id.*)

4

Dr. Burke noted Williams' "ratings of [I.A.B.'s] adaptive skills are much lower than expected given her generally [a]verage cognitive functioning, which may be influenced by reported behavioral challenges in the home setting."  (Tr. 574.)  She diagnosed I.A.B. with Language Disorder; Unspecified Disruptive, Impulse-Control, and Conduct Disorder; and Unspecified Sleep-Wake Disorder.  (Tr. 575.)  She assessed a Global Assessment of Functioning[2] ("GAF") score of 49.  (*Id*.)  Dr. Burke recommended I.A.B. undergo evaluation for a special needs preschool and develop a predictable routine.  (*Id*.)

On January 13, 2016, I.A.B. followed up with Dr. Walker to review Dr. Burke's testing. (Tr. 571.)  Dr. Walker noted I.A.B. had been attending speech therapy for the past six months and her language and articulation skills were improving.  (*Id*.)  Williams reported I.A.B. only knew 15-20 words, but Dr. Walker noted "in the office today she using quite a few more, and using consistent 2 word sentences and even up to five words at a time."  (*Id*.)  During the office visit, I.A.B was able to follow two-step unrelated commands, use appropriate pronouns and was "quite social and engaging."  (*Id*.)

Williams also reported continued behavioral problems.  (*Id*.)  Dr. Walker noted I.A.B. was in PCIT and receiving behavioral services to improve her sleep patterns.  (*Id*.)  Dr. Walker observed the recent developmental testing was overall average, with the only delay being in

---

[2]       Dr. Burke's report appears to reference the Global Assessment of Functioning (or "GAF") scale for adults rather than the Children's GAS.  The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A score between 41 and 50 indicates serious symptoms or serious difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

expressive language.  (*Id.*)  He encouraged I.A.B. to continue her participation in speech therapy and PCIT.  (*Id.*)

On January 14, 2016, I.A.B. attended a session of occupational therapy with Patricia Cunningham, OTR/L.  (Tr. 521.)  Williams reported it was becoming increasingly difficult to manage I.A.B.'s behaviors.  (*Id.*)  I.A.B.'s therapy goals included the ability to use her arm, while not "acting like it was in a cast."  (*Id.*)  I.A.B. was cooperative and followed directions during the therapy session.  (*Id.*)  I.A.B. returned to occupational therapy with Ms. Cunningham on March 3, 2016.  (Tr. 545.)  Williams reported I.A.B. did not tolerate having her hair or fingernails touched.  (*Id.*)

I.A.B. continued to attend speech therapy.  On March 31, 2016, she attended her twenty-first session with speech pathologist Carolyn Bauer, SLP.  (Tr. 558.)  At that time, Ms. Bauer administered the Goldman-Fristoe Test of Intelligibility and I.A.B. fell within the 55th percentile. (Tr. 459.)  Ms. Bauer determined I.A.B had reached all her therapy goals, as she demonstrated appropriate speech and language skills when compared to typically developing same-age peers. (Tr. 558.)  Ms. Bauer recommended I.A.B. discontinue speech therapy, but continue behavioral therapy.  (*Id.*)  On April 7, 2016, I.A.B. was discharged from occupational therapy, as she had met all her therapy goals.  (Tr. 560.)

On April 28, 2016, I.A.B. underwent an evaluation through Help Me Grow to determine if she qualified for a special needs preschool.  (Tr. 756.)  She was taken to a preschool classroom, where her abilities to interact and participate in classroom activities were observed. (*Id*.)  Based upon this evaluation, it was determined I.A.B. did not qualify for a special needs preschool.  (*Id*.)  On May 10, 2016, Help Me Grow staff members informed Williams I.A.B did

not qualify for a special needs preschool and provided her with information on participating in Headstart.  (Tr. 758.)  During this meeting, I.A.B. was able to independently sit and play with toys.  (*Id*.)

I.A.B. underwent a consultation with sleep specialist Michael Neeb, Ph.D., on May 4, 2016.  (Tr. 765.)  Williams also attended and provided information regarding I.A.B.'s sleep patterns.  (*Id*.)  She indicated I.A.B. went to bed around 8:00-9:00 p.m., but would not fall asleep until 1:00-2:00 a.m., after crawling into bed with Williams.  (*Id*.)  Dr. Neeb noted Williams felt "she cannot emotionally handle the crying and screaming that comes from the patient when mom attempts to set limits . . . mom takes the path of least resistence and lets the daughter have her way on most things."  (*Id*.)  Dr. Neeb also observed "there appears to be no structural[sic] in the house."  (Tr. 766.)  He recommended Williams focus on setting a consistent waketime for I.A.B., in an attempt to shift I.A.B.'s sleep schedule to a normal time.  (Tr. 765.)  Dr. Neeb also ordered a sleep study.  (*Id*.)

On June 9, 2016, I.A.B. underwent a sleep study.  (Tr. 680.)  The study confirmed mild sleep apnea, decreased sleep efficiency, delayed sleep latency, and periodic limb movement disorder.  (Tr. 688.)  A July 30, 2016 neck x-ray confirmed enlarged tonsils and adenoids.  (Tr. 794.)

I.A.B. and Williams attended PCIT counseling on July 12, 2016 with counselor Kristen Barry, LISW.  (Tr. 633.)  Williams expressed frustration over I.A.B.'s behaviors, reporting I.A.B. injured herself as a result of not listening and was struggling with toilet training.  (*Id*.)  During the session, I.A.B. played quietly and independently with toys, but had difficulty sharing with her sister at times.  (*Id*.)  She was able to follow directions and cleaned up her mess.  (*Id*.)

7

Ms. Barry noted I.A.B. was "pleasant and cooperative for the majority of the session." (*Id.*)

***State Agency Opinions***

On May 4, 2015, I.A.B. underwent a consultative psychological examination with Bryan J. Krabbe, Psy.D. (Tr. 342-347.) Williams also attended and provided information regarding I.A.B.'s condition. (*Id.*) I.A.B. was 22 months old at the time. (Tr. 342.) Williams reported I.A.B. was "hyper" and required "extra attention." (*Id.*) She reported I.A.B. crawled at 9 months, walked at 12 months, and spoke single words at 11 months, but "has yet to use two or three word sentences." (Tr. 343.) Williams also advised Dr. Krabbe I.A.B. "doesn't listen . . .she plays rough . . .she flips things over . . . she stands on tables . . . she needs 24 hour supervision . . . she eats Styrofoam cups . . .she throws glass. . . she scratches herself to get attention." (Tr. 344.) Finally, Williams reported I.A.B. had poor sleep and did not play with other children. (*Id.*)

On mental status examination, Dr. Krabbe noted I.A.B. "was a somewhat cooperative child with whom rapport was adequately established" and "separated easily from her mother." (Tr. 344.) Her conversational speed was within normal limits, she "spoke few words with no sentences," her receptive language skills were adequate, her "articulation was 50% intelligible," and her "thought processes were clear and logical for her age." (*Id.*) She made adequate eye contact during the evaluation, and energy level was somewhat elevated. (*Id.*) I.A.B. did not present with any manifestations of anxiety, but she displayed a somewhat limited attention span. (*Id.*)

Dr. Krabbe administered the Bayley Scales of Infant and Toddler Development on I.A.B., which revealed low average cognitive, language, and motor scores. (Tr. 345.) Based

upon Williams report, I.A.B.'s social-emotional functioning score was in the extremely low

range.  (*Id.*)  Dr. Krabbe noted there "was a significant difference between observed results and

reports by Ms. Williams," as Williams "appears to underestimate [I.A.B.'s] capabilities."  (*Id.*)

Dr. Krabbe also provided the following discussion:

> While Ms. Williams reports disruptive behavior at home, [I.A.B.] was
> behaved for her age during the exam.  Further, available records are not
> indicative of significant behavior problems.  It is this examiner's opinion
> that Ms. Williams report may be more indicative of a limited understanding
> of childhood development rather than psychopathology.

(Tr. 345-346.)

Based upon the examination findings, Dr. Krabbe found I.A.B. did not meet the criteria

for any diagnosis.  (Tr. 346.)  Dr. Krabbe provided a functional assessment, describing I.A.B.'s

abilities and limitations as follows:

**Describe the claimant's abilities and limitations in acquiring and using information relative to the functioning of typically-developing children of the same age.**

The claimant presented within adequate limits in completing cognitive, language, and motor tasks.  The claimant displayed some problems with distraction, which could lead to difficulty acquiring new information.  The claimant was able to converse in an age appropriate manner during the evaluation.  As such, the claimant's abilities and limitations in acquiring and using information are relative to the functioning of typically-developing children of the same age.

**Describe the claimant's abilities and limitations in attending to and completing tasks relative to the functioning of typically-developing children of the same age.**

The claimant displayed effective task persistence when answering questions.  The claimant displayed some indications of distraction during the evaluation including inattentiveness and the examiner having to redirect their attention.  The claimant has some problems with attention and concentration at home including impulsive behavior and difficulty with focus, although it appears to be age appropriate.  As such, the claimant's abilities and limitations in attending to and completing tasks are relative to the functioning of typically-developing children of the same age.

9

**Describe the claimant's abilities and limitations in interacting and relating with others relative to the functioning of typically-developing children of the same age.**

The claimant interacted in an age appropriate manner and was pleasant during the evaluation. The claimant has limited interactions with other children and regularly fights her sister according to her mother's report. The claimant presented with adequate levels of intellectual functioning, which suggests no cognitive impairment understanding or responding to teacher feedback and adequately relating to peers. As such, the claimant's abilities and limitations in interacting and relating with others are relative to the functioning of typically-developing children of the same age.

**Describe the claimant's abilities and limitations in self-care relative to the functioning of typically-developing children of the same age.**

The claimant has age appropriate management of several aspects of self-care including feeding and dressing. The claimant has age appropriate ability to regulate her emotions. The claimant has age appropriate ability to carry out tasks with multiple steps. As such, the claimant's abilities and limitations in self-care and emotion regulation are relative to the functioning of typically-developing children of the same age.

(Tr. 346-347.)

In June 2015, state agency physician Rachel Rosenfeld, M.D., and state agency speech language pathologist Mary Jones, M.A., reviewed I.A.B's records and completed a Childhood Disability Evaluation. (Tr. 134-136.) They concluded I.A.B. had no limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, Moving About and Manipulating Objects, Health and Physical Well-Being, and Caring for Yourself. (*Id*..)

On October 9, 2015, I.A.B. underwent a consultative speech language assessment with Eltina Davis, SLP. (Tr. 454-456.) Williams also attended and provided information regarding I.A.B.'s condition. (*Id*.) Ms. Davis noted I.A.B. was "engaging, cooperative, attentive, and

10

exhibited a pleasant demeanor." (Tr. 455.)  During the evaluation, I.A.B. was "observed to use single words and two word phrases spontaneously and in response to communicate attempts." (*Id*.)  Her intelligibility was fair, but her "articulation skills are at risk for delay due to limited verbal expression." (*Id*.)  Her social language skills were grossly within normal limits.  (*Id*.) Based upon this assessment, Ms. Davis recommended I.A.B. attend speech therapy to address her articulation deficit.  (*Id*.)

In November 2015, state agency psychologist Bruce Goldsmith, Ph.D., state agency speech language pathologist Melissa Hall, SLP, and state agency physician Frank Stroebel, M.D., reviewed I.A.B.'s records and completed a Childhood Disability Evaluation.  (Tr. 151-154.)  They found I.A.B. had a less than marked limitation in the domains of Acquiring and Using Information and Interacting and Relating With Others.  (*Id*.)  They concluded I.A.B. had no limitation in the remaining domains of Attending and Completing Tasks, Moving About and Manipulation of Objects, Caring For Yourself, and Health and Physical Well-Being.  (*Id*.)

***Hearing Testimony***

During the September 13, 2016 hearing, Williams, on behalf of I.A.B., testified as follows:

- I.A.B. is three years old.  (Tr. 90.)  She lives with her mother and sister.  (*Id*.) She is currently enrolled in Early Head Start, which she attends four days a week.  (Tr. 90-91.)  She takes a bus with other preschoolers.  (Tr. 91.)

- She "was getting into a lot of stuff and a lot of playing and hurted[sic] her arm and stuff like that, and had listening problems." (*Id*.)  She broke her arm in the past year, and required a cast and occupational therapy.  (Tr. 91-92.)  She broke her arm because she was "overplaying too much" and "not listening."  (Tr. 101.)

- She will run into parking lots and does not understand cars will hurt her.  (Tr. 92.) She attend behavioral therapy 2-3 times a month.  (Tr. 93.)

11

- She received 6-9 months of speech therapy.  (Tr. 93.)  Her speech has improved, but Williams still has trouble understanding her on occasion.  (Tr. 94.)  Williams testified I.A.B. "had a delay in understanding me, and it was driving me crazy because I didn't know how to deal with it until they came in and evaluated her." (*Id*.)

- She is not toilet trained.  (Tr. 95.)  She cannot dress herself.  (*Id*.)  She can feed herself, but has slight trouble using a spoon. (Tr. 96.)

- She has "sensory problems," in which she does not want her hair, fingernails or toes to be touched.  (Tr. 97.)  She sleeps poorly and needs to have her adenoids surgically removed to correct this issue.  (*Id*.)  She also has restless leg syndrome, which keeps her up at night.  (Tr. 98.)  Medications improved her restless leg syndrome.  (*Id*.)

- She plays with other children at her school.  (Tr. 99.)  She does not get along with her sister.  (Tr. 100.)  She plays with her sister's friends. (*Id*.)

### III.  Standard for Disability

To qualify for SSI benefits, an individual must demonstrate a disability as defined under the Act.  "An individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S .C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process.  20 C.F.R. § 416.924(a).  At step one, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At step two, a child must suffer from a "severe impairment."  20 C.F.R. § 416.924(c).  At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment.  20 C.F.R. § 416.926a(a).  The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled.  20 C.F.R. § 416.926a(d).  To receive SSI benefits, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning.  20 C.F.R. § 416.926a(e)(2)(i).  "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i).  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id.*

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked."  20 C.F.R. § 416.926a(e)(3)(I).  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id.*

If an impairment is found to meet, or qualify as the medical or functional equivalent of a listed disability and the twelve-month durational requirement is satisfied, the claimant will be

deemed disabled. 20 C.F.R. § 416.924(d)(1).

## IV. Summary of Commissioner's Decision

The ALJ made the following findings regarding I.A.B. in the November 9, 2016 decision:

1.  The claimant was born on June **, 2013. Therefore, she was an older infant on February 23, 2015, the date application[sic] was filed, and is currently a preschooler (20 CFR 416.926a(g)(2)).

2.  The claimant not engaged in substantial gainful activity since February 23, 2015, the application date (20 CFR 416.924(b) and 416.971 *et seq.*)

3.  The claimant has the following severe impairments: expressive language delay variously diagnosed as other speech disturbance, phonological disorder, expressive language disorder; and expressive language delay; sleep disorder, variously diagnosed as mild obstructive sleep apnea and behavioral insomnia, and disruptive behavior disorder (20 CFR 416.924(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925, and 416.926).

5.  The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.  The claimant has not been disabled, as defined in the Social Security Act, since February 23, 2015, the date the application was filed (20 CFR 416.924a).

(Tr. 60-80.) The ALJ found I.A.B. had "less than marked" limitations in the domains of Acquiring and Using Information, Interacting and Relating With Others, and Caring For Yourself. (Tr. 72, 75, 78.) The ALJ concluded I.A.B. had no limitation in the domains of Attending and Completing Tasks, Moving About and Manipulating Objects, and Health and Physical Well-Being. (Tr. 73, 76, 79.)

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.

14

*See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir.2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983). Substantial evidence has been defined as " 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772–3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir.1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

15

supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov.1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov.15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

### VI. Analysis

### *Consideration of the Listings*

The Commissioner asserts substantial evidence supports the ALJ's conclusion I.A.B. did not meet or equal any listed impairment.  (Doc. No. 12 at 8.)  She argues the ALJ properly discussed Listing 111.09 (communication impairments) and Listing 112.02 (organic mental disorders) as the Listings "potentially applicable in Plaintiff's case."  (*Id*.)  The Commissioner maintains "Plaintiff did not meet her burden of demonstrating that she qualified for childhood disability benefits under any listed impairment."  (*Id.* at 9.)  She notes the opinions of the state agency consultants support a finding I.A.B.'s conditions did not meet or equal any listed impairment.  (*Id*. at 14.)  As noted *supra*, Plaintiff has not provided any specific challenges to the

ALJ's findings.  (Doc. No. 11 at 1.)

A child will be found disabled if her impairments meet or medically equal one of the Listing of Impairments. 20 C.F.R. §§416.924(d)(1).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to "cause marked and severe functional limitations" for children.  20 C.F.R. § 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. § 416.925(c)(3).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. § 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a).  It is the claimant's burden to bring forth evidence to establish her impairments meet or are medically equivalent to a listed impairment in order to secure entitlement to children's social security benefits.  *Woodall v. Colvin*, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411,

17

414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make

sufficiently clear the reasons for her decision.  *Id.* at 416-17.

> Here, the ALJ provided the following discussion at step three:
>
> The claimant's impairment neither meets nor medically equals a childhood listing, including 111.09 (communication impairment) and 112.02 (organic mental disorders).  The undersigned finds that the record does not reflect marked limitations in two areas of functioning or extreme limitations in any area resulting from the claimant's impairments, including the claimant's cognitive/communicative function, social functioning, age-appropriate personal functioning, or in maintaining concentration, persistence, or pace.  Accordingly, the evidence fails to satisfy the requirements of the above listings.
>
> With respect for the "paragraph B" criteria, the objective medical evidence shows that the claimant has the following degree of limitations in the broad areas of functioning set out in the disability Regulations for evaluating mental disorders and in the mental disorder Listings found in 20 CFR, Part 404, Subpart P, Appendix 1: a less than marked limitation in age-appropriate cognitive/communicative function; less than marked limitation in age-appropriate social functioning; less than marked in age-appropriate personal functioning; and less than marked limitations in maintaining concentration, persistence, or pace (secondary to speech and language delays).

(Tr. 60-61.)

The ALJ then provided a detailed review of the evidence relating to I.A.B.'s speech

delays, behavioral problems, sleep disorder, and cognitive abilities under Finding #5.  (Tr. 62-

70.)  This recitation of the evidence is nearly 8 pages long and includes a thorough discussion of

the objective medical evidence, the treatment modalities, the developmental testing, and the

examination findings related to I.A.B's various impairments.  (*Id.*)

Plaintiff does not specifically challenge any aspect of the ALJ's determination I.A.B. did

not meet or equal a Listing.  (*See* Doc. No. 11.)  Because the Court has not been provided with

any argument regarding Listings, it will limit its discussion to the Listings specifically invoked

by the ALJ, Listings 111.09 and 112.02.

    *a.*    *Listing 111.09*

Substantial evidence supports the ALJ's conclusion I.A.B. does not meet the

requirements of Listing 111.09. Listing 111.09 addresses communication impairments

associated with a documented neurological disorder. 20 C.F.R. Pt. 404, Subpart P, App. 1,

§111.09. This Listing is defined as follows:

> *111.09 Communication impairment*, associated with documented
> neurological disorder and one of the following:
>
> A. Documented speech deficit that significantly affects (see 111.00K1) the
> clarity and content of the speech.
>
> OR
>
> B. Documented comprehension deficit resulting in ineffective verbal
> communication (see 111.00K2) for age.
>
> OR
>
> C. Impairment of hearing as described under the criteria of 102.10 or
> 102.11.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §111.09.

A speech deficit that "significantly affects" the clarity and content of speech is defined as

follows:

> Significantly affects means that you demonstrate a serious limitation in
> communicating, and a person who is unfamiliar with you cannot easily
> understand or interpret your speech.

20 C.F.R. Pt. 404, Subpt. P., App 1 §111.0K. The regulations further define "ineffective verbal

communication as follows:

> Ineffective verbal communication means that you demonstrate serious
> limitation in your ability to communicate orally on the same level as other

19

children of the same age and level of development.

*Id.*

At step two, the ALJ determined I.A.B. suffered from the severe impairments of, among other things, "expressive language delay variously diagnosed as other speech disturbance, phonological disorder, expressive language disorder; and expressive language delay." (Tr. 60.) The ALJ then determined, at step three, I.A.B.'s impairments did not meet or equal Listing 111.09. (Tr. 60-61.)

Later in the decision, the ALJ discussed, at length, I.A.B.'s speech delay, her diagnostic testing, and the success of her speech therapy. He noted a February 2015 developmental evaluation which determined I.A.B. qualified for services in the areas of expressive and cognitive communication. (Tr. 63.) He observed May 2015 testing confirmed receptive and expressive language skills in the low average range. (Tr. 64.) He further noted how, at that time, I.A.B. spoke "few words and no sentences." (*Id.*) The ALJ also discussed other diagnostic testing in the record which confirmed below average speech and language skills. (Tr. 66, 67.)

The ALJ then discussed how I.A.B.'s speech therapy improved her language skills. (Tr. 63-64.) He noted by October 2015 I.A.B. was "demonstrating significant improvement with expressive communication." (Tr. 64.) By January 2016, I.A.B. was "using more than 30 words independently during speech therapy sessions." (Tr. 67.) The ALJ observed I.A.B.'s pediatrician noted improvements in I.A.B.'s language and articulation. (*Id.*) The ALJ discussed how "after attending 21 [speech therapy] sessions, the claimant responded well with full compliance with therapeutic speech activities, and mastered all her speech therapy goals." (Tr. 68.) The ALJ specifically noted updated testing confirmed "intelligibility and articulation was

20

within functional levels when compared to typically developed same-aged peers." (*Id*.)  It is clear from this discussion the ALJ properly considered Listing 111.09.

Substantial evidence supports the ALJ's conclusion I.A.B. does not meet Listing 111.09. Although I.A.B. has a confirmed developmental delay in her expressive language skills, the record does not indicate it was related to any diagnosed neurological disorder, as required by the Listing.  (Tr. 571.)  There is no evidence I.A.B. had any hearing impairment.  Moreover, after completing speech therapy, I.A.B. demonstrated "appropriate speech and language skills when compared to typically developing same aged peers."  (Tr. 558.)

Accordingly, the Court finds Plaintiff has not satisfied her burden of demonstrating the ALJ erred in finding she did not meet the requirements of Listing 111.09.

> b.    *Listing 112.02.*

Substantial evidence also supports the ALJ's conclusion I.A.B. does not meet the requirements of Listing 112.02.  At the time[3] of I.A.B.'s administrative hearing, Listing 112.02 provided the criteria for evaluating organic mental disorders.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §112.02 (revised version effective January 17, 2017).  This Listing was defined as follows:

> *112.02 Organic Mental Disorders*: Abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain. The history and physical examination or laboratory tests, including psychological or neuropsychological tests, demonstrate or support the presence of an organic factor judged to be etiologically related to the abnormal mental state and associated deficit or loss of specific cognitive abilities, or affective changes, or loss of previously acquired functional abilities.

---

[3]    A revised version of Listing 112.02 took effect on January 17, 2017, two months after the ALJ decision was issued.  Listing 112.02 now provides the criteria for evaluating neurocognitive disorders.  *See Revised Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66138-01, 2016 WL 5341732 (Sept. 26, 2016).

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented persistence of at least one of the following:

1. Developmental arrest, delay or regression; or

2. Disorientation to time and place; or

3. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

4. Perceptual or thinking disturbance (e.g., hallucinations, delusions, illusions, or paranoid thinking); or

5. Disturbance in personality (e.g., apathy, hostility); or

6. Disturbance in mood (e.g., mania, depression); or

7. Emotional lability (e.g., sudden crying); or

8. Impairment of impulse control (e.g., disinhibited social behavior, explosive temper outbursts); or

9. Impairment of cognitive function, as measured by clinically timely standardized psychological testing; or

10. Disturbance of concentration, attention, or judgment;

AND

B. Select the appropriate age group to evaluate the severity of the impairment:

1. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the following:

    a. Gross or fine motor development at a level generally acquired by children no more than one-half the child's chronological age, documented by:

    (1) An appropriate standardized test; or

22

(2) Other medical findings (see 112.00C); or

b. Cognitive/communicative function at a level generally acquired by children no more than one-half the child's chronological age, documented by:

(1) An appropriate standardized test; or

(2) Other medical findings of equivalent cognitive/communicative abnormality, such as the inability to use simple verbal or nonverbal behavior to communicate basic needs or concepts; or

c. Social function at a level generally acquired by children no more than one-half the child's chronological age, documented by:

(1) An appropriate standardized test; or

(2) Other medical findings of an equivalent abnormality of social functioning, exemplified by serious inability to achieve age-appropriate autonomy as manifested by excessive clinging or extreme separation anxiety; or

d. Attainment of development or function generally acquired by children no more than two-thirds of the child's chronological age in two or more areas covered by a., b., or c., as measured by an appropriate standardized test or other appropriate medical findings.

2. For children (age 3 to attainment of age 18), resulting in at least two of the following:

a. Marked[4] impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate

---

[4]    As noted *supra*, a "marked" limitation is one which seriously interferes with functioning. 20 C.F.R. § 416.926a(e)(2)(i). "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.*

standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §112.02 (revised version effective January 17, 2017).

At step two, the ALJ determined I.A.B. suffered from the severe impairment of, among other things, disruptive behavior disorder.  (Tr. 60.)  The ALJ then determined, at step three, I.A.B.'s impairments did not meet or equal Listing 112.02.  (Tr. 60-61.)

Later in the decision, the ALJ evaluated I.A.B.'s behavior, her participation in behavioral therapy, and the developmental testing.  (Tr. 62-69.)  He noted I.A.B.'s participation in occupational therapy and Parent-Child Interaction Therapy.  (Tr. 63.)  He discussed, at length, the results of I.A.B.'s May 2015 developmental testing with Dr. Krabbe, which revealed low average intellectual abilities, low average receptive and expressive language skills, and low average fine and gross motor skills.  (Tr. 63-64.)  The ALJ acknowledged I.A.B.'s extremely low social-emotional functioning score, but discussed how this score was based upon Williams' report.  (Tr. 64.)  He noted Dr. Krabbe's observation Williams "appeared to underestimate the claimant's capabilities."  (*Id*.)

24

The ALJ also discussed January 2016 psychological testing which indicated cognitive, visual reception, fine motor, and receptive language scores in the average range.  (Tr. 67.)  He noted I.A.B. was discharged from occupational therapy in April 2016, after meeting her goals, and did not qualify for a special needs preschool.  (Tr. 68, 69.)  He provided a lengthy discussion regarding I.A.B.'s observed behaviors versus the reports of Williams, noting I.A.B.'s behavior was "significantly more benign than what the claimant's mother reported."  (Tr. 64.)  It is clear from this discussion the ALJ properly considered Listing 112.02.

Substantial evidence supports the ALJ's conclusion I.A.B. did not meet Listing 112.02. Although I.A.B. has documented behavioral issues which require treatment, the record does not indicate an organic factor was "etiologically related" to her behavioral concerns.  While she may have had emotional lability and poor impulse control, the standardized testing in the record does not indicate her motor, cognitive, communication, or social skills were at the levels required by the Listing.  Specifically, June 2015 language testing indicating I.A.B. was only 2-6 months behind in her language development.  (Tr. 424.)  January 2016 developmental testing yielded a composite score of 92, which was in the average range.  (Tr. 571.)  During her May 2015 consultative examination, Dr. Krabbe administrated the Bayley Scales of Infant and Toddler Development, which revealed low average cognitive, language, and motor scores.  (Tr. 345.) While I.A.B.'s social-emotional functioning score was in the extremely low range, it was based upon her mother's report.  (*Id.*)  Moreover, neither the treatment records nor any of the opinion evidence contained in the record support a finding I.A.B. was markedly limited in any manner. Indeed, the opinions of the state agency physicians and the consultative examiners indicate none to less than marked limitations.  (Tr. 134-135, 151-154, 346-347.)

25

Finally, although the ALJ did not discuss specific medical evidence in the Step Three discussion, the ALJ's decision as a whole, including his functional equivalency analysis, provides sufficient information and analysis to allow this Court to conduct a meaningful judicial review and to conclude the ALJ's findings are supported by substantial evidence. *See Rainey-Stiggers*, 2015 WL 729670 at * 7 (citing *Forrest v. Comm'r of Soc. Sec*., 591 F. App'x 359, 366 (6th Cir. Nov. 17, 2014) (and cases cited therein). *See also Kern v. Comm'r of Soc. Sec*., 2017 WL 1324609 at * 2 (S.D. Ohio April 11, 2017) ("The Commissioner's decision may be upheld where the ALJ made sufficient factual findings elsewhere in his decision to support the conclusion at step three."). Moreover, there is no basis for remand because no reasonable fact-finder could find that there are "medically documented findings" sufficient to meet the listing criteria. *See Hufstetler v. Comm'r of Soc. Sec*., 2011 WL 2461339, at *10 (N.D.Ohio June 17, 2011) (An ALJ's failure to explain how she reached her step three meets or equals conclusion can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner.)

Accordingly, the Court finds substantial evidence supports the ALJ's conclusion I.A.B. did not meet or equal any Listed impairment.

### Functional Equivalence

The Commissioner also argues substantial evidence supports the ALJ's determination I.A.B.'s impairments did not functionally equal the Listings. (Doc. No. 12 at 15.) Specifically, she maintains the ALJ's findings were supported by the opinions in the record, the medical testing, and the "other evidence of record as discussed above and throughout the ALJ's

decision." (*Id.* at 16.) The Commissioner notes while "Plaintiff's mother asserts that Plaintiff has had three more diagnoses . . .a diagnosis does not reveal that a condition is severe or disabling. (*Id.*) The Commissioner concludes as "Plaintiff has not provided a basis to reverse or remand the ALJ's decision," it should be upheld. (*Id.* at 17.)

Beyond noting I.A.B.'s new diagnoses (ADHD, restless leg syndrome, impulse control and conduct disorder), the Plaintiff does not provide any argument as to why the ALJ's decision is not supported by substantial evidence. (Doc. No. 11 at 1.)

To functionally equal the listings, an impairment(s) must be of listing-level severity; i.e. it must result in "marked" limitations in two domains of functioning[5] or an "extreme" limitation in one domain. *See* 20 C.F.R. § 416.926a(a); Social Security Ruling ("SSR") 09–1p, 2009 WL 296031 (February 17, 2009). In determining whether a child has a "marked"[6] or "extreme"[7] limitation, the Agency will:

... consider your functional limitations resulting from all of your impairments,

---

[5]    The domains of functioning are (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) healthy and physical well-being. See 20 C.F.R. §416.926a(b)(1).

[6]    A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is "more than moderate" but "less than extreme." *Id.* "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.*

[7]    An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked." *Id.* " It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*

including their interactive and cumulative effects. We will consider all the
relevant information in your case record that helps us determine your functioning,
including your signs, symptoms, and laboratory findings, the descriptions we have
about your functioning from your parents, teachers, and other people who know
you, and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929.

20 C.F.R. § 926a(e). The factors set forth in §§ 416.924a, 416.924b, and 416.929 include, but

are not limited to the following: how well a child can initiate and sustain activities; how much

extra help a child needs; the effects of structured or support settings; how a child functions in

school; and the effects of medications or other treatment. *See* 20 C.F.R. § 416.926a(a). In

determining whether a child functionally equals a listing, ALJs need not discuss all of the

considerations set forth in 20 C.F.R. § 926a and SSR 09–1p; however, they must "provide

sufficient detail so that any subsequent reviewers can understand how they made their findings."

SSR 09–1p.[8]

    Because Plaintiff does not provide any specific challenges to the ALJ's determination

with respect to any specific domain, the undersigned will generally consider the ALJ's findings

for all six domains. Here, the ALJ concluded, at step two, I.A.B. suffered from language delays,

a sleep disorder, and disruptive behavior disorder. (Tr. 60.) After determining I.A.B. did not

meet or medically equal any listing, the ALJ determined I.A.B.'s impairments did not

---

[8]     In assessing functional equivalence, the Agency employs a "whole child"
approach. Under this approach, "[w]e focus first on the child's activities, and
evaluate how appropriately, effectively, and independently the child functions
compared to children of the same age who do not have impairments. 20 CFR §
416.926a(b) and (c). We consider what activities the child cannot do, has
difficulty doing, needs help doing, or is restricted from doing because of the
impairments. 20 CFR 416.926a(a). Activities are everything a child does at
home, at school, and in the community, 24 hours a day, 7 days a week." SSR
09–2p, 2009 WL 396032 (February 18, 2009). The Agency next evaluates the
effects of a child's impairments by rating the degree to which the impairment(s)
limits functioning in the six domains. SSR 09–2p.

functionally equal the severity of the Listings.  (Tr. 60-61.)  Specifically, with regard to the six

domains of functioning, the ALJ found as follows:

> (1)    The claimant has less than marked limitations in acquiring and using
>         information;
>
> (2)    The claimant has no limitation in attending and completing tasks;
>
> (3)    The claimant has less than marked limitation in interacting and
>         relating with others;
>
> (4)    The claimant has no limitation in moving about and manipulating
>         objects;
>
> (5)    The claimant has less than marked limitation in the ability to care for
>         herself; and
>
> (6)    The claimant has no limitation in health and physical well-being.

(Tr. 72-79.)

The Court finds substantial evidence supports the ALJ's determination I.A.B. did not

functionally equal the listings.  As the ALJ correctly notes, while I.A.B. required speech therapy,

she improved with treatment.  At age two, I.A.B. was displaying expressive language delays and

articulation errors and her pediatrician, Dr. Walker, referred her for speech therapy.  (Tr. 571.)

Within six months of therapy, Dr. Walker noted improvement in I.A.B.'s language skills, as she

was using consistent two-word sentences and appropriate pronouns.  (*Id.*)

In March 2016, after twenty-one visits of speech therapy, I.A.B. had mastered all her

therapy goals, and demonstrated "appropriate speech and language skills when compared to

typically developing same aged peers."  (Tr. 558.)  Her speech therapist, Carolyn Bauer, SLP,

recommended I.A.B. discontinue speech therapy due to "mastery and age appropriate skills."

(*Id*.)  In the decision, the ALJ appropriately cited to all this evidence and discussed, at length,

her improvement. (Tr. 62-69.) Demonstrated improvement of a condition undermines a claim for functional disability. *See Clark v. Comm'r of Soc. Sec.*, 2016 WL 7241966, at *8 (N.D. Ohio Dec. 15, 2016).

With respect to her behavioral problems, the ALJ acknowledged Williams' reports of "oppositional and negative attention seeking behaviors." (Tr. 68.) However, as the ALJ correctly noted, the objective observations of I.A.B.'s treating and examining sources indicate her behavioral problems were not as significant as alleged by Wiliams. During I.A.B.'s May 2015 consultative examination with Dr. Krabbe, Williams reported I.A.B. "doesn't listen . . .she plays rough . . .she flips things over . . . she stands on tables . . . she needs 24 hour supervision . . . she eats Styrofoam cups . . .she throws glass. . . she scratches herself to get attention." (Tr. 344.) However, Dr. Krabbe noted I.A.B. "was a somewhat cooperative child with whom rapport was adequately established" and "separated easily from her mother." (Tr. 344.) During testing, Dr. Krabbe noted there "was a significant difference between observed results and reports by Ms. Williams," as she "appears to underestimate [I.A.B.'s] capabilities." (*Id.*) Dr. Krabbe theorized "Ms. Williams[sic] report may be more indicative of a limited understanding of childhood development rather than psychopathology." (Tr. 345-346.)

I.A.B.'s treating sources documented similar findings. In June 2015, Dr. Walker noted I.A.B. was able to follow single commands and a two-step related command. (Tr. 423.) When I.A.B. returned to Dr. Walker in January 2016, she was "quite social and engaging." (Tr. 571.) During a July 2016 counseling session, I.A.B. was "pleasant and cooperative" and was able to play quietly and independently. (Tr. 633.) She also followed directions and cleaned up her mess. (*Id.*)

30

The ALJ also acknowledged I.A.B.'s need for occupational therapy and Parent-Child Interaction Therapy.  (Tr. 63.)  However, I.A.B. successfully completed occupational therapy in April 2016.  (Tr. 560.)  I.A.B. did not qualify for a special needs preschool.  (Tr. 756, 758.)  With regards to I.A.B.'s sleep disorder, the ALJ correctly relied on evidence indicating a portion of I.A.B.'s sleep issues were due to a lack of structure and Williams' permissiveness at bedtime. (Tr. 65, 765, 766.)

These difficulties with speech, behavior, and sleep, while not disabling, do impact I.A.B.'s functioning to some degree.  The ALJ accounted for this, finding less than marked limitations in the domains of interacting and relating with others, acquiring and using information, and the ability to care for herself.  (Tr. 72-79.)  These findings are supported by the above-discussed evidence.  Moreover, the diagnostic testing throughout the record provides further support for the ALJ's conclusion I.A.B. did not have "marked" or "extreme" limitations in any domain.  Psychological testing in January 2016 indicated an Early Learning Composite score in the average range, with average abilities in visual reception, fine motor, and receptive language.  (Tr. 573, 574.)  A March 2016 Goldman-Fristoe Test of Intelligibility indicated intelligibility and articulation within functional levels.  (Tr. 558.)  May 2015 testing revealed low average cognitive, language, and motor scores.  (Tr. 345.)

Finally, every opinion contained in the record supports a finding I.A.B. was not markedly limited in any domain.  Consultative examiner Dr. Krabbe opined I.A.B.'s abilities to acquire and use information, attend to and complete tasks, interact and relate with others, and provide self-care and emotional regulation were "relative to the functioning of typically-developing children of the same age."  (Tr. 346-347.)  Speech language pathologist Eltina Davis opined I.A.B. had

31

poor articulation skills and limited verbal expression, but found her social language skills were grossly within normal limits.  (Tr. 455.)  State agency physician Rachel Rosenfeld, M.D., and state agency speech language pathologist Mary Jones, M.A., concluded I.A.B. has no limitations in any of the domains.  (Tr. 134-136.)  State agency psychologist Bruce Goldsmith, Ph.D., state agency speech language pathologist Melissa Hall, SLP, and state agency physician Frank Stroebel, M.D., found I.A.B. had a less than marked limitation in the domains of Acquiring and Using Information and Interacting and Relating With Others, but no limitation in the remaining domains.  (Tr. 151-154.)  These medical opinions provide substantial evidence in support of the ALJ's finding I.A.B. had no more than "less than marked" limitations in any domain.

In sum, the ALJ provided a thorough analysis, weighing the evidence in the record, regarding whether I.A.B.'s impairments "functionally equaled" a listing with respect to the six functional equivalence factors.  Accordingly, substantial evidence supports the ALJ's conclusion I.A.B did not have a "marked" or "extreme" limitations in any domain, and thus, did not functionally equal the listings.

## VII.  Conclusion

For the foregoing reasons, the Court finds the decision of the Commissioner is not supported by substantial evidence.  Accordingly, it is recommended the decision of the Commissioner be AFFIRMED.


Date: September 18, 2018                                    s/ *Jonathan D. Greenberg*
                                                           Jonathan D. Greenberg
                                                           U.S. Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

33